Aric N. Williams (SBN:304775)
14 NE 1st Ave, Suite 200
Miami FL, 33132
[phone]: (305) 776-0219
Aric@aricwilliamslaw.com
*Attorney for Plaintiff, Phoenix Entertainment Partners, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Phoenix Entertainment Partners, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>S. C. E. A Holdings, LLC, D.B.A.<br>FIREWATER BAR and LANCELOT<br>VICTOR CUMMINGS<br><br>        Defendants. | Case No. _____<br><br><br>REQUEST FOR JURY TRAIL<br><br>(F.R.C.P. Rule 38) |

## **COMPLAINT**

The Plaintiff, Phoenix Entertainment Partners, LLC ("Phoenix"), by its counsel, complains of the Defendants, and for its Complaint alleges as follows:

## **JURISDICTION OF THE COURT**

1.      This is an action for trademark infringement in which the Defendants stand accused of supplying customers and patrons with karaoke accompaniment tracks marked with Phoenix's federally registered trademarks and providing karaoke entertainment services in connection with Phoenix's federally registered trademarks; all without authorization.

2.     This action arises under §§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125, as amended, as to the trademark infringement and unfair competition claims. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

3.     This Court further has jurisdiction pursuant to 28 U.S.C. § 1338(a), in that this civil action arises under acts of Congress relating to trademarks, and, as to the Plaintiff's federal unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

4.     This Court has supplemental jurisdiction over the subject matter of Phoenix's state law claim pursuant to 28 U.S.C. § 1367(a), in that the claim is so related to Phoenix's federal claims that they form part of the same case or controversy.

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the Defendants reside in this State and judicial district.

6.     This Court has personal jurisdiction over each of the Defendants, based upon the Defendants' residence in this State and judicial district and conduct of significant business here, and in that the acts of which the Defendants stand accused were undertaken in this State and judicial district.

**THE PLAINTIFF**

7.     Phoenix is a North Carolina limited liability company having its principal place of business in Pineville, North Carolina.

**THE DEFENDANTS**

8.     Defendant LANCELOT VICTOR CUMMINGS ("Lancelot") is an individual who operates a mobile entertainment business with at least one purpose of which is to provide karaoke-related services.

9.     Defendant S. C. E. A Holdings, LLC, D.B.A. FIREWATER BAR ("Firewater") is a California limited liability company that operates an eating and drinking establishment under the trade name Firewater Bar in Ontario, California, at which karaoke entertainment is provided.

## BACKGROUND FACTS

10.     Karaoke is a popular form of participatory entertainment commonly found in bars and restaurants and other types of venues throughout the United States.

11.     The basic premise of a karaoke show is that the venue hosting the show provides patrons with access to a sound system and specially prepared karaoke accompaniment tracks, so that individual patrons may perform for the crowd.

12.     Generally, a "karaoke accompaniment track" is an audiovisual work comprising a re-recorded version of a popular song without the lead vocals synchronized to a graphical component containing a lyric display, cueing information, and other information.

13.     When a karaoke accompaniment track is publicly performed, the graphical component is displayed to the patron who is performing and may be displayed to the crowd as well.

14.     Venues that offer karaoke entertainment, including some of the Defendants, do so as part of a commercial transaction wherein the venues supply their patrons with access to karaoke tracks and karaoke entertainment services in exchange for their patronage of the establishment and, they hope and expect, the purchase of food and beverages.

15. The purchase and consumption of alcoholic beverages in connection with karaoke shows is particularly encouraged to enable patrons to overcome inhibitions against singing in public.

16. Most venues that offer karaoke entertainment hire mobile entertainment operators to provide the karaoke tracks and the karaoke entertainment services on the venues' behalf.

17. Phoenix is the owner of SOUND CHOICE, a well-known and leading brand of karaoke accompaniment tracks that is particularly well known to commercial karaoke operations including bars, restaurants, and other venues as described above.

18. Over the course of nearly three decades in business, Slep-Tone Entertainment Corporation ("Slep-Tone"), Phoenix's predecessor in interest re-recorded and released in excess of 16,500 SOUND CHOICE-branded popular songs on special compact discs known as CD+G ("compact disc plus graphics") discs and, more recently, a subset of that catalog in another common karaoke format, MP3+G ("MP3 plus graphics") on compact discs.

19. SOUND CHOICE-branded karaoke tracks are wildly popular among karaoke entertainment providers, patrons, and home consumers.  According to some estimates, as corroborated by investigative data, more than half of all accompaniment tracks played at karaoke shows in the United States originated from Slep-Tone's recordings.

20. The popularity of SOUND CHOICE karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist, a characteristic highly valued by karaoke singers.

21. SOUND CHOICE karaoke tracks are also perceived by the market as providing highly accurate singing cues as part of the video display, a characteristic that is also highly valued by karaoke singers.

22.     Slep-Tone and its successor Phoenix have released their karaoke tracks for commercial users <u>only</u> on compact discs[1] and not on any other form of carrier (such as computer hard drives or through internet downloads).

23.     Over time, however, it has become technologically possible to create karaoke accompaniment tracks, using the SOUND CHOICE CD-based tracks as a template, for storage on alternative media, such as computer hard drives.

24.     In most cases, the creation of such non-original tracks results in an imitation of a SOUND CHOICE track, which imitation is degraded from and inferior to the original because of digital compression of the data as the format is converted from native CD+G audio and graphics to compressed audio and graphics.

25.     The process outlined above is known as "media-shifting," because the information is being copied from one medium to another, and "format-shifting," because the information is being modified from one format to another for use on a different medium.

26.     These media-shifting and format-shifting activities involve a reduction in the quality of the audiovisual works, because the formats used require the use of compressed audio in the resulting tracks.

27.     These media-shifting and format-shifting activities also usually result in the placement of the SOUND CHOICE brand upon the resulting non-original new tracks.

28.     Easy electronic duplication of media-shifted tracks has resulted in the widespread copying of SOUND CHOICE-branded karaoke tracks unaccompanied by the acquisition of any discs at all.

29.     This copying allows karaoke accompaniment track users to gain the benefit of using SOUND CHOICE-branded karaoke tracks without paying for original discs.

---

[1] In the beginning, Slep-Tone released its karaoke tracks on cassette tapes as well, but that technology was focused on the home consumer and has since become fully obsolete.

30.     Karaoke accompaniment track users have used the available technology to place the duplicated contents of one purchased disc on two or more computer systems for simultaneous use; to place the duplicated contents of their patrons' discs on their own computer hard drives at a show; to "swap" song files with other users; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with duplicates of karaoke tracks; and to sell any original media they might have owned in the secondary market once they have media-shifted.

31.     To the extent that the Defendants have undertaken any of the activities described in the preceding paragraph, those activities have been undertaken wholly without any form of permission from or payment to Phoenix.

## THE RIGHTS OF THE PLAINTIFF

32.     Phoenix is the owner of the federal and state trademark and service mark registrations listed in Annex A and Annex B hereto ("the Sound Choice Marks"), by virtue of an assignment instrument from Slep-Tone dated February 15, 2015.

33.     Slep-Tone acquired its rights in the Sound Choice Marks by virtue of its registrations based on use of the marks (a) by applying the Sound Choice Marks to goods, which goods were then sold and transported in interstate commerce, and (b) in connection with the advertising and performance of karaoke entertainment services, either directly or by related companies that include hundreds of controlled licensees.

34.     Phoenix is also the sole owner of Sound Choice Entertainment, LLC, a Texas limited liability company ("SCE") that is engaged in the business of providing karaoke entertainment services to venues in various locations around the United States.

35.     Phoenix and its predecessor have, for the entire time the Sound Choice Marks have been federally registered, provided the public, including the Defendant, with notice of those

federal registrations through the consistent application of the symbol ® to its marks on goods and in connection with services, when appropriate.

36.     Principally, the Sound Choice Marks are indicators of Phoenix as the origin of physical karaoke accompaniment tracks that have been marked with the Sound Choice Marks and of karaoke entertainment services provided in connection with the Sound Choice Marks.

## THE ACTIVITIES OF THE DEFENDANTS

**A.     Defendant Lancelot**

37.     Defendant Lancelot operates a mobile entertainment business, Music and Memories Disc Jockey and Karaoke, through which he supplies karaoke accompaniment tracks and provides karaoke entertainment services to his venue customers and other customers.

38.     In order to supply karaoke accompaniment tracks to a venue, Defendant Lancelot or a person in his employ transports the karaoke accompaniment tracks to the venue.

39.     In order to obtain the infringing karaoke tracks or to supply them to a venue, the infringing karaoke tracks are transported in commerce, using computer networks and/or public roadways.

40.     Defendant Lancelot uses computer software to access and play the karaoke accompaniment tracks upon a request by a patron to sing the song represented by the track.

41.     A substantial number—the exact number of which will be ascertained through discovery—of the karaoke accompaniment tracks Defendant Lancelot supplies to the venue are marked with the Sound Choice Marks and are specifically identified in his computer system, by name or other symbol, as SOUND CHOICE tracks.

42.     The physical tracks so marked and so supplied to the venue were not made by Phoenix or under its direction or control.

43.   Defendant Lancelot did not have Phoenix's permission to mark any karaoke accompaniment tracks with the Sound Choice Marks or to make any karaoke accompaniment tracks marked with the Sound Choice Marks.

44.   The karaoke accompaniment tracks that Defendant Lancelot supplied to the venues and that were marked with the Sound Choice Marks were and are counterfeit.

45.   Upon information and belief, Defendant Lancelot has created or has caused to be created at least one karaoke system.

46.   Defendant Lancelot was and is paid by each of his venue customers to supply the karaoke accompaniment tracks so marked.

47.   In order to supply karaoke entertainment services to a venue, Defendant Lancelot prepares and executes a karaoke show, either himself or through one or more persons in his employ, by acquiring, or acquiring access to, appropriate sound equipment for playing karaoke accompaniment tracks; connecting the sound equipment to a source for karaoke accompaniment tracks (to wit, the tracks supplied as indicated above); causing selected karaoke accompaniment tracks to be played over the sound equipment; controlling the organization and flow of the performances; and acting as the on-microphone emcee of the show.

48.   During the course of supplying these karaoke entertainment services, Defendant Lancelot repeatedly displays the Sound Choice Marks in connection with the services.

49.   Because of the well-known association of the Sound Choice Marks with karaoke entertainment services, the display of the Sound Choice Marks in connection with the services, regardless of the particular song being played, acts as a general advertisement for the services as well as an indicator of the quality of the services being provided.

50.   Because of the frequent, repeated display of the Sound Choice Marks across numerous instances of widely disparate songs, patrons and other consumers of  Defendant Lancelot's karaoke entertainment services are likely to view the display of the Sound Choice

Marks as an indicator of the affiliation, connection, or association of Defendant Lancelot and Music and Memories Disc Jockey and Karaoke with Phoenix, or of Phoenix's sponsorship or approval of his services and related commercial activities, rather than merely as the creator of the underlying communicative content of any particular song being performed.

51.     The foregoing activities undertaken in connection with the Sound Choice Marks were undertaken in derogation of Phoenix's rights in the Sound Choice Marks.

52.     Consumers of Defendant Lancelot's goods and services are likely to be confused regarding the origin or sponsorship of the goods in use and regarding the affiliation or connection of Defendant Lancelot and Music and Memories Disc Jockey and Karaoke with Phoenix, based on their mistaken belief that the goods being supplied were made by Phoenix and that the services being provided are provided with Phoenix's knowledge and approval.

53.     As a result of those activities, Phoenix has been damaged through the loss of revenues associated with the sale or licensing of legitimate goods and services, as well as through the loss of Phoenix's ability to control the quality of goods marked and services provided in connection with the Sound Choice Marks.

54.     Upon information and belief, Defendant Lancelot has conducted similar infringing activities with respect to numerous other tracks containing the Sound Choice Marks and Phoenix believes that discovery in this matter will reveal those activities as well as the unauthorized public performance of tracks belonging to Phoenix.

55.     Defendant Lancelot did not have Phoenix's permission to make or acquire the copies.

56.     Defendant Lancelot's acts of reproduction were undertaken in derogation of Phoenix's exclusive rights in those audiovisual works.

57.     As a result of those unauthorized acts of reproduction and public performance, Phoenix has been damaged.

**B.     The Defendant, Firewater**

58.     Defendant Firewater hosts karaoke shows comprising karaoke entertainment services at its establishment.

59.     At these karaoke shows, Defendant Firewater supplied karaoke accompaniment tracks to their patrons by contracting with a third party operator as its agent for doing so.

60.     Specifically, Defendant Firewater contracted with Defendant Lancelot for that purpose.

61.     Defendant Firewater induced its third-party agent to transport the karaoke accompaniment tracks to the venue.

62.     A substantial number—the exact number of which will be ascertained through discovery—of the karaoke accompaniment tracks Defendant Firewater supplied to its patrons are marked with the Sound Choice Marks and are specifically identified in the computer system that contains them, by name or other symbol, as SOUND CHOICE tracks.

63.     The physical tracks so marked and so supplied were not made by Phoenix or under its direction or control.

64.     Defendant Firewater did not have Phoenix's permission to mark any karaoke accompaniment tracks with the Sound Choice Marks; to make any karaoke accompaniment tracks marked with the Sound Choice Marks; or to induce, authorize, or otherwise arrange for any third party to do so.

65.     At the karaoke shows, the karaoke accompaniment tracks supplied to the Defendant Firewater's patrons are played upon the patrons' requests, so that the patrons may sing along for entertainment purposes.

66.     The karaoke accompaniment tracks that Defendant Firewater supplied to its patrons (through Lancelot) and that were marked with the Sound Choice Marks were and are counterfeit.

67.     As the patrons are supplied with karaoke entertainment services, the Sound Choice Marks are repeatedly displayed in connection with the services.

68.     Because of the well-known association of the Sound Choice Marks with karaoke entertainment services, the display of the Sound Choice Marks in connection with the services, regardless of the particular song being played, acts as a general advertisement for the services as well as an indicator of the quality of the services being provided.

69.     Because of the frequent, repeated display of the Sound Choice Marks across numerous instances of widely disparate songs, patrons who received Defendant Firewater's karaoke entertainment services are likely to view the display of the Sound Choice Marks as an indicator of the affiliation, connection, or association of the Defendant Firewater with Phoenix, or of Phoenix's sponsorship or approval of the services and related commercial activities, rather than merely as indicating Phoenix as the creator of the underlying communicative content of any particular song being performed.

70.     The foregoing activities undertaken in connection with the Sound Choice Marks were undertaken in derogation of Phoenix's rights in the Sound Choice Marks.

71.     Defendant Firewater's patrons are likely to be confused regarding the origin or sponsorship of the goods being supplied and regarding the affiliation or connection of Defendant Firewater with Phoenix, based on their mistaken belief that the goods being supplied were made by Phoenix and that the services being provided are provided with Phoenix's knowledge and approval.

72.     As a result of those activities, Phoenix has been damaged through the loss of revenues associated with the sale or licensing of legitimate goods and services, as well as through

the loss of Phoenix's ability to control the quality of goods marked and services provided in connection with the Sound Choice Marks.

73. The supplying of the tracks and the provision of the services are an essential part of a commercial transaction wherein the patrons purchase food and beverages and receive access to the tracks and to the services in connection with their patronage, even if the patrons do not directly pay for access to the tracks or the services.

74. When the karaoke shows are ongoing, the shows are generally the principal entertainment focus of Defendant Firewater's establishment.

75. Defendant Firewater derives value from the karaoke shows in the form of increased patronage and increased sales of food and beverages.

76. Upon information and belief, Defendant Firewater has advertised the availability of karaoke shows on its premises, via its own advertising apparatus and as an activity attributable to its business, rather than as adjunct or auxiliary to its businesses.

77. In order to obtain the infringing karaoke tracks or to supply them at its establishment for use by the patrons, Defendant Firewater induced the transportation of the infringing karaoke tracks in commerce, using computer networks and/or public roadways.

78. Defendant Firewater has had actual knowledge of the foregoing activities being undertaken at its establishment.

79. Specifically, Defendant Firewater was notified by Phoenix by a letter dated **July 8, 2016**, of the unlicensed, infringing character of the karaoke entertainment services being provided in its establishment.

80. In the letter, Defendant Firewater was offered information about licensing and compliance programs that Phoenix offers to venues that feature karaoke entertainment, along with the opportunity to bring its karaoke entertainment services into compliance with the law and with Phoenix's policies regarding the use of its intellectual property.

81.     In particular, Defendant Firewater was offered the opportunity, at no charge, to request, via Phoenix's Safe Harbor program, that Phoenix evaluate the licensing status and needs of its karaoke entertainment provider and to avoid liability as long as the venue took heed of Phoenix's evaluation and acted accordingly.

82.     Defendant Firewater did not take advantage of the Safe Harbor program.

83.     Despite these offers, and despite its knowledge of the unlicensed, infringing character of the karaoke entertainment services being provided in its establishments, Defendant Firewater did not elect to bring its karaoke entertainment services into compliance.

84.     Defendant Firewater has the right to control the means and the details of the process by which its third-party agent(s) accomplish their respective tasks, including, without limitation, controlling the dates and starting and stopping times of shows, determining whether particular content (such as offensive-language content) is permitted to be played at shows, determining the style and genre of music played at shows, and determining whether the third-party agent is permitted to use Defendant Firewater's equipment (such as television displays, sound equipment, stage, etc.) as part of the shows.

85.     In particular, Defendant Firewater has the right to control whether or not the activities occur on its premises.

86.     Despite Defendant Firewater having knowledge of the infringing character of the activities and ability to control whether those activities occur, Defendant Firewater did not elect to stop the infringement from occurring.

87.     As such, to the extent that it is not directly liable as an infringer, Defendant Firewater is liable as a secondary infringer for the continuing infringement that has occurred and is occurring on its premises.

**C.     The Defendants' pattern of infringing conduct**

88.     The Defendants' conduct as described above with respect to the Sound Choice Marks is not isolated to Sound Choice accompaniment tracks, but also extends as part of a large-scale program of infringing activities and piracy of numerous other producers' karaoke tracks, on the same terms.

89.     Essentially, the Defendants have built an entire business model and moneymaking scheme premised on a competitive advantage derived from the infringement of the intellectual property rights of others, including Phoenix.

90.     The Defendants' activities constitute unfair competition against Phoenix's own licensees, all of whom provide karaoke entertainment services without engaging in that infringement.

91.     The Defendants' wrongful conduct exerts illegitimate and unfair pressure upon the market for karaoke services in this State and judicial district through the unlicensed use of pirated material belonging to Phoenix and to other producers, thereby diminishing the value of licenses and permissions in the hands of Phoenix, its subsidiary, and its licensees.

92.     The diminution of the value of licenses encourages or forces karaoke operators to forego licenses in order to compete profitably.

93.     Upon information and belief, the Defendants' misconduct has cost Phoenix in excess of $100,000 in revenue from legitimate sources crowded out of the market by their wrongful conduct.


**FIRST CLAIM FOR RELIEF**
**TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114(1)**

94.     Phoenix repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

95.     Each Defendant used a reproduction, counterfeit, or copy of the Sound Choice Marks in connection with the production of goods and with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks; by providing the Defendant's patrons with access to the goods; or by repeatedly displaying the reproduction, counterfeit, or copy of the Sound Choice Marks during the provision of those services.

96.     Each Defendant's use of the Sound Choice Marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

97.     Phoenix did not license any Defendant to manufacture or acquire reproductions, counterfeits, or copies of, or to use, the Sound Choice Marks in connection with the provision of their services or to provide any patrons with access to goods marked with the Sound Choice Marks.

98.     Each Defendant's use of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive its customers and patrons into believing that the goods to which access is provided are bona fide karaoke accompaniment tracks authorized by Phoenix, and that the services being provided are provided with the authorization of Phoenix.

99.     Each Defendant's acts were willful, knowing, and intentional.

100.    Each Defendant that has hired a third-party agent to supply infringing karaoke tracks and to provide karaoke entertainment services is additionally vicariously liable for the infringing acts of that agent.

101.    Each Defendant's activities constitute the infringement of the federally registered Sound Choice Marks in violation of 15 U.S.C. § 1114(1).

102.    Phoenix has been damaged by each Defendants' infringing activities.

103.    Unless enjoined by the Court, each Defendant's infringing activities as described above will continue unabated and will continue to cause harm to Phoenix.

1
2
## SECOND CLAIM FOR RELIEF
### UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

3      104.    Phoenix repeats and incorporates by reference herein its allegations contained in
4  the above paragraphs of this Complaint.

5      105.    Each Defendant has supplied karaoke accompaniment tracks marked with the
6  Sound Choice Marks to customers or patrons.

7      106.    Each Defendant has supplied karaoke entertainment services to customers or
8  patrons, in connection with which the Sound Choice Marks were used in the advertising and
9
10 performance of the services and not merely as an adjunct to the playing of any particular
11 communicative content contained within karaoke accompaniment tracks.

12     107.    The use of the Sound Choice Marks is likely to cause confusion, or to cause
13 mistake, or to deceive the customers or patrons into believing, falsely, that Phoenix manufactured
14
15 the karaoke accompaniment tracks being supplied or sponsored or approved the Defendant's
16 services and commercial activities.

17     108.    The presence of the Sound Choice Marks on the goods supplied to the customers
18 or patrons is also likely to cause confusion, or to cause mistake, or to deceive those receiving
19 access to the goods into believing, falsely, that the goods being supplied to them were sold by
20 Phoenix and purchased or otherwise licensed by the Defendant.

21     109.    Because of each Defendant's wholly unauthorized uses of the Sound Choice
22 Marks in the manner described above, Phoenix was denied revenue from the sale or licensing of
23
24 authorized goods and services and deprived of control over the use of the Sound Choice Marks.

25     110.    Because Phoenix has been denied this revenue and control, it has been damaged
26 by each Defendant's uses.

27     111.    Phoenix is a provider of karaoke entertainment services, directly, through
28 controlled licensees, and through its wholly owned subsidiary SCE.

16

112.    Each Defendant's activities are part of a program and money-making scheme premised upon the unlicensed use of pirated copies of karaoke accompaniment tracks belonging to Phoenix and other karaoke producers.

113.    Each Defendant's activities in furtherance of this program of infringement have caused a competitive injury to Phoenix, both directly and on the basis of damage to Phoenix's licensees.

114.    Each Defendant's activities constitute unfair competition in violation of 15 U.S.C. § 1125(a).

115.    Unless enjoined by the Court, each Defendant's unfair competition activities as described above will continue unabated and will continue to cause harm to Phoenix.

**THIRD CLAIM FOR RELIEF**
**CALIFORNIA DECEPTIVE TRADE PRACTICES ACT**
**AGAINST ALL DEFENDANTS**

116.    Phoenix repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

117.    Defendants' used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks during the provision of those services.

118.    Defendants' acts of infringement occurred during the conduct of trade or commerce, from which Defendants' derived an economic benefit.

119.    Defendants' acts of infringement constitute unfair or deceptive acts or practices within the meaning of California Bus. & Prof. Code §17200, et seq.

120.     Defendants' acts of infringement cause likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by Phoenix.

121.     As a direct and proximate result of each of Defendants' acts of infringement Phoenix has suffered a pecuniary loss, including the loss of revenue associated with sales of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for Defendants' acts in creating or acquiring counterfeits of SOUND CHOICE-branded accompaniment tracks.

122.     As such, Phoenix has been damaged and is likely to be further damaged by a deceptive trade practice of Defendants' within the meaning of California Bus. & Prof. Code §17200, et seq.  Unless enjoined by the Court, Defendants' unfair competition activities as described above will continue unabated and will continue to cause harm to Phoenix.

**FOURTH CLAIM FOR RELIEF**
**COMMON LAW UNFAIR COMPETITION**
**AGAINST ALL DEFENDANTS**

123.     Phoenix repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

124.     Defendants' used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks during the provision of those services.

125.     Defendants' use of the Sound Choice Marks was "in commerce" within the meaning ascribed by California common law.

126.    Phoenix did not license Defendants' to make, acquire, or use reproductions, counterfeits, or copies, or to use the Sound Choice Marks in connection with the services provided to its commercial establishments.

127.    Use of the Sound Choice Marks in the manner attributable to Defendants' is likely to cause confusion, or to cause mistake, or to deceive customers at the venues in which Defendants' performs into believing that the services those customers are receiving are being provided with the authorization of Phoenix using bona fide, legitimate, authorized karaoke accompaniment tracks.

128.    Defendants' acts were willful and knowing.

129.    Phoenix has been damaged by infringing activities of Defendants.

130.    Unless enjoined by the Court, Defendants' infringing activities as described above will continue unabated and will continue to cause harm to Phoenix.


## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Phoenix prays for judgment against each of the Defendants severally, and that the Court:

A.    Find that each Defendant has committed acts of infringement, including but not limited to counterfeiting, of the federally registered Sound Choice Marks, in violation of 15 U.S.C. § 1114(1);

B.    Find that each Defendant has engaged in unfair competition detrimental to Phoenix in violation of 15 U.S.C. § 1125(a);

C.    Enter judgment against each Defendant and in favor of Phoenix on all applicable counts;

D.    Award to Phoenix each Defendant's profits and the damages sustained by Phoenix because of that Defendant's conduct in infringing the Sound Choice Marks, or, in the alternative,

19

statutory damages per trademark infringed by counterfeiting, and in any event in an amount not less than $50,000 per Defendant;

E.    Award to Phoenix each Defendant's profits and the damages sustained by Phoenix because of that Defendant's acts of unfair competition under 15 U.S.C. § 1125(a);

F.    Award to Phoenix treble, punitive, or otherwise enhanced damages, as available, upon a finding that any Defendant acted willfully in the conduct of its infringement;

G.    Order all computer disks, drives, or other media belonging to each Defendant, which media contain counterfeits of Phoenix's marks, to be delivered up or seized for destruction;

H.    Grant Phoenix preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks and further false designations of origin, by each Defendant, specifically including injunctive relief against the making, copying, sharing, selling, or otherwise using digitized copies of karaoke accompaniment tracks, commercially or otherwise, which tracks are marked with any mark or other designation belong to any person from whom the Defendant has not obtained written authorization from the owner thereof to make, copy, share, sell, or otherwise use the digitized copy;

I.    Award Phoenix its costs of suit and attorney's fees, to the extent not awarded above; and

J.    Grant Phoenix such other and further relief as justice may require.

DATED: November 4, 2016

By:    Aric N. Williams
       Attorney for Plaintiff
       Phoenix Entertainment Partners, LLC

## **DEMAND FOR TRIAL BY JURY**

Plaintiff Phoenix Entertainment Partners, LLC pursuant to Rule 38 of the Federal Rules of Civil Procedure hereby demands trial by jury of all issues so triable in the present action.

DATED: November 4, 2016

By:     Aric N. Williams
        Attorney for Plaintiff
        Phoenix Entertainment Partners, LLC

21

## ANNEX A

### FEDERAL TRADEMARK REGISTRATIONS

**Reg. No.        Mark                                          Reg. Date**
**Goods/Services**

1,923,448        SOUND CHOICE                                  October 3, 1995
Pre-recorded … compact discs containing musical compositions and compact discs containing video related to musical compositions
*Renewed December 7, 2004, and August 18, 2015*

2,000,725        SOUND CHOICE & Design (see below)             September 17, 1996
Pre-recorded … compact discs containing musical compositions and compact discs containing video related to musical compositions
*Renewed November 29, 2006, and April 5, 2016*

4,099,045        SOUND CHOICE                                  February 14, 2012
Conducting entertainment exhibitions in the nature of karaoke shows

4,099,052        SOUND CHOICE & Design (see below)             February 14, 2012
Conducting entertainment exhibitions in the nature of karaoke shows

"SOUND CHOICE & Design" refers to the following display mark:

## **ANNEX B**

### **STATE TRADEMARK REGISTRATIONS**

**Reg. No.        Mark                                                    Reg. Date**
**Goods/Services**

115195  SOUND CHOICE & Design (see below)                    August 8, 2013

Compact Disc plus graphics (CD+G); karaoke/DVD multi-format player in class 9.

68690     SOUND CHOICE & Design (see below)                    August 8, 2013

Compact Disc plus graphics (CD+G); karaoke/DVD multi-format player in class 41.

"SOUND CHOICE & Design" refers to the following display mark:



23